AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Colorado

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

A Black Apple Iphone 7 Plus,
S/N C39SW3DJHFY2

)
)
)
)
)
)
)

Case No.   20-sw-00124-MEH

## APPLICATION FOR A SEARCH WARRANT

I, Jon E. Beutelschies, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property located in the District of Colorado *(identify the person or describe the property to be searched and give its loction)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit
The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C., Section 1951 | Hobbs Act |
| Title 21, U.S.C., Section 843(b) | Prohibited use of a telephone |
| Title 18, U.S.C., Section 371 | Conspiracy |

☒ Continued on the attached affidavit, which is incorporated by reference.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Jon E. Beutelschies*
*Applicant's signature*

Jon E. Beutelschies, Special Agent, FBI
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:  02/04/2020

*Michael E. Hegarty*
*Judge's signature*

City and state:   Denver, CO

Michael E. Hegarty, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A**

**<u>DESCRIPTION OF LOCATION TO BE SEARCHED</u>**

A black Apple iPhone 7 Plus, S/N C39SW3DJHFY2 (hereinafter and in Attachment B the

"Device(s)") currently held in evidence at the Denver office of the FBI, address 8000 E.

36th Ave., Denver, Colorado, 80238.

## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

For the Device(s) listed and described in Attachment A, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of violations of Title 18, United States Code, Section 1951; Title 21, United States Code, Section 843(b) and Title 18, United States Code, Section 371 (Conspiracy) (the "**Subject Offenses**"):

1. Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of **Subject Offenses**:

2. Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Device(s) or by other means for the purpose of committing violations of **Subject Offenses**.

3. Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of **Subject Offenses**.

4. Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of **Subject Offenses**.

5. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of **Subject Offenses** or that show who used, owned, possessed, or controlled the Device(s).

6. Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Device(s), or that aid in the identification of persons involved in violations of **Subject Offenses**.

7. Credit card information, bills, and payment records pertaining to violations of **Subject Offenses**.

8. Information about usernames or any online accounts or email addresses.

9. Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of **Subject Offenses**.

10. Evidence of who used, owned, or controlled the Device(s) to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were

created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence.

11. Evidence of software that may allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software.

12. Evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence.

13. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s).

14. Evidence of how and when the Device(s) were used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

15. The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the Device(s).

16. Passwords, encryption keys, and other access devices that may be necessary to access the Device(s).

17. Contextual information necessary to understand the evidence described in this attachment.

DEFINITIONS:

18. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## AFFIDAVIT

I, Jon E. Beutelschies, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for over twenty-two years.  I am currently assigned to the Colorado Springs Resident Agency of the FBI wherein my duties and responsibilities include the investigation of public corruption and other criminal matters. I have authored numerous search warrant affidavits and have received training in the processing and examination of digital evidence.

2. This affidavit is submitted in support of an application for a search warrant for device(s), (more fully described in Attachment A), and the data located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1951; Title 21, United States Code, Section 843(b) and Title 18, United States Code, Section 371 (Conspiracy) (the "Subject Offenses").

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1951; Title 21, United States Code, Section 843(b) and Title 18, United States Code, Section 371 (Conspiracy) (the "Subject Offenses") are located in the place described in Attachment A.

4. The information contained within the affidavit is based on my training and experience, my participation in the investigation as well as information imparted to me by other law enforcement officers involved in this investigation.

## IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

5. Several items are held in evidence at the FBI Evidence Room in Denver, Colorado, which were discovered in the possession of Eligio Lee Camacho, Eligio Johnny Camacho III and Brian Jeffrey Valencia, and seized pursuant to Search Warrants issued by United States Magistrate Judge Nina Y. Wang, District of Colorado, case numbers: 20-sw-00048-NYW, 20-sw-00049-NYW, and 20-sw-00050-NYW. They are all being held in evidence under case number 194D-DN-2193370.  The items include the following:  a black LG cellular telephone, S/N 912VTYK1970706; a blue LG cellular telephone, S/N 904VTKE0378949 and a black Apple iPhone 7 Plus, S/N C39SW3DJHFY2, hereinafter and in relevant Attachments A and B the "Device(s)."

6. Your Affiant believes there is probable cause to believe that the Device(s) are or contain evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section

1951; Title 21, United States Code, Section 843(b) and Title 18, United States Code, Section 371 (Conspiracy) (the "Subject Offenses"). The applied-for warrant would authorize the forensic examination of the Device(s) for the purpose of identifying electronically stored data particularly described in Attachment B.

7. The Device(s) are currently in the lawful possession of the FBI. They came into the FBI's possession in the following way: Search Warrants, as detailed above, were executed on January 23, 2020 and the items were seized. Therefore, while your Affiant might already have all necessary authority to examine the Device(s), your Affiant seeks this additional warrant out of an abundance of caution to be certain that an examination of the Device(s) will comply with the Fourth Amendment and other applicable laws.

8. The Device(s) are currently in storage at the Denver office of the FBI, address 8000 East 36th Ave., Denver, Colorado, 80238. In my training and experience, I know that the Device(s) all have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the Device(s) first came into the possession of the FBI.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

9. Based on my training and experience, your Affiant knows about the following items, hereinafter and below and in the Attachments "Device(s)."

10. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Such telephones may also contain removable storage media, such as a flash card—such devices can store

any digital data, and can have the capacity to store many gigabytes of data.  Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet.  They operate as GPS navigation devices and can store information about where they have been.  They also contain digital cameras. The camera can mark a photo with location data so that upon examination it can be determined where and when a photo was taken.  These images can sometimes be recovered even if the user has deleted the image.  The smartphone can also connect to the internet using wireless connections, which allow for images, files and other information to be uploaded directly to the Internet or to other digital storage devices or computers.  Smartphones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations.  They can also operate as a "tablet," or mobile computer, and can contain software programs called applications.  Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.  They also operate as personal digital assistants and have contacts and calendar functions. They also can contain media such as music and other files in large quantity.

11. Based on my knowledge, training, and experience, your Affiant knows that the Device(s) can store information for long periods of time.  Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on the Device(s).  This information can often be recovered with forensic tools.

12. Based on my knowledge, training, and experience, examining data stored on a digital storage device such as the Device(s) can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

13. There is probable cause to believe that things that were once stored on the Device(s) may still be stored there, for at least the following reasons:

    A. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    B. Wholly apart from user-generated files, digital devices like the Device(s) can contain electronic evidence of how it has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operations.  Users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

3

C.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

14. *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device(s) that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device(s) were used, the purpose of the use, who used the Device(s), and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device(s) because:

A.  Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of other devices to it, and the dates and times the device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.  This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

B.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C.  A person with appropriate familiarity with how devices such as a smartphone works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how the devices were used, the purpose of their use, who used them, and when.

D.  The process of identifying the exact electronically stored information on a smartphone or other digital device that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

4

E.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

F.  Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: Call logs, text messages, names and telephone numbers and location data.

G.  Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

15. *Need to review evidence over time and to maintain entirety of evidence.*  Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this

5

application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

16. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device(s) consistent with the warrant.  The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device(s) or information from a copy of the Device(s) consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device(s) to human inspection in order to determine whether it is evidence described by the warrant.

## INVESTIGATION

17. In or about March 2019, the FBI began investigating Eligio Lee Camacho ("E. CAMACHO") a resident of Rocky Ford, Colorado, for narcotics distribution.  During the investigation, a FBI Confidential Human Source ("CHS") was utilized and had numerous discussions with E. CAMACHO about narcotics and E. CAMACHO's association with then Rocky Ford Police Department ("RFPD") Officer Brian Jeffrey Valencia ("VALENCIA").

18. In October 2018, Task Force Officer Joseph Cahill contacted Francine Gonzales, Chief of Investigations, Colorado Department of Revenue ("CDOR"), Motor Vehicle Investigations Unit, for assistance with creating a fictitious Colorado license plate record for use in the investigation.  Gonzales created the following record:  Colorado license plate BML194, associated with a 2007, black Honda Civic, with a registered owner of Jose Torrez, address 2134 S. Richfield Way, Aurora, Colorado, 80013-4131.

19. On March 8, 2019, E. CAMACHO met with the CHS at the CHS's apartment in Rocky Ford. The CHS discussed purchasing marijuana and methamphetamine from E. CAMACHO and obtaining protection from the police for his/her drug trafficking activities. E. CAMACHO said that he was "good with the police" and told the CHS that RFPD Officer Brian Valencia (VALENCIA) was a friend and had provided information to him in the past. E. CAMACHO said that VALENCIA helped his father, Eligio Johnny Camacho III ("J. CAMACHO"), avoid a domestic violence arrest. The CHS provided E. CAMACHO with Colorado license plate number BML194 and said that he/she would pay VALENCIA for the information regarding the registered owner.  E. CAMACHO said that VALENCIA would run it when he returned to duty.

6

20. On March 12, 2019, the CHS met with E. CAMACHO in Rocky Ford and their conversation was recorded.  The CHS asked what was up with E. CAMACHO's boy, referring to VALENCIA, and E. CAMACHO said he was waiting for the cop to let him know what's up.  E. CAMACHO said that he (VALENCIA) is off duty right now, or he would have already done it.  CHS said he had five points ($500.00) for him and E. CAMACHO said, "trust me, I need the cheese" (money).  E. CAMACHO said that VALENCIA told him that he could get the address, but that E. CAMACHO had to wait for him (to get back to duty), so there would be no questions asked.  Later, E.CAMACHO said, "Let me call my dad, I'll actually see when that fool gets back on duty."  E. CAMACHO called his father (J. CAMACHO) in front of the CHS and their conversation can be heard on the recording.  E. CAMACHO said, "Dad, so when does Valencia get back, the, on Sunday?"  J. CAMACHO said that he thought so and that he would find out.  E. CAMACHO said that he needed to get the address and J. CAMACHO said to give it to him and that he would give it to him (VALENCIA).  E. CAMACHO said, "yeah the license plate number" and J. CAMACHO said, "whatever you need, don't say it out loud, whatever you need" and E. CAMACHO said that he would text J. CAMACHO the number.  The CHS provided E. CAMACHO's cell phone number to investigating Agents as 719-468-0595.

   i.   According to cell phone records provided by Verizon Wireless, on March 12, 2019, at approximately 6:06 p.m., 719-468-0595 (E. CAMACHO) called 719-469-9203.  I believe that this is the call that E. CAMACHO placed to his father, J. CAMACHO, as referenced above.  Although Verizon Wireless records do not show a subscriber for 719-469-9203, I believe, based on the call above and public source information, that the user of the phone number is J. CAMACHO.

   ii.   According to cell phone records provided by Verizon Wireless, on March 12, 2019, between 6:14 p.m. and 6:18 p.m., 719-469-9203 (J. CAMACHO) and 719-468-9403 exchanged numerous text messages.  Cell phone records provided by Verizon Wireless show that the subscriber for 719-468-9403 is Bryan Valencia, address 405 Bradus, La Junta, Colorado.  VALENCIA was interviewed by your Affiant on December 5, 2019, and provided his cell phone number as 719-468-9403.

21. On March 13, 2019, at approximately 8:56 p.m., Colorado license plate BML194 was queried through the Colorado Crime Information Center ("CCIC").  According to records from CCIC, Colorado license plate BML194 was queried by Nikolai Scott Silvia, who I believe is a dispatcher at the Rocky Ford Police Department, and the requesting Officer is referenced as "BVALE", which I believe is a reference to Brian Valencia (VALENCIA).

   i.   According to cell phone records provided by Verizon Wireless, on March 13, 2019, between approximately 8:49 p.m. and approximately 8:54 p.m., 719-469-9203 (J. CAMACHO) sent two text messages to and received three text messages from 719-468-9403 (VALENCIA).  On the same date, at approximately 9:12 p.m., 719-469-9203 (J. CAMACHO) called 719-468-0595 (E. CAMACHO) and the call lasted approximately 62 seconds.

22. On March 13, 2019, at approximately 9:16 p.m., E. CAMACHO called the CHS and their conversation was recorded. E. CAMACHO told the CHS that the number did not come up as nothing and asked the CHS if he/she was sure that it was the right number. E. CAMACHO said that he (VALENCIA) ran it right here in front of me and it came up not-existent. E. CAMACHO said that he can run it one more time tonight and to make sure it is the right number and that he (VALENCIA) can only run so many a night.

   i.   To test the license plate prior to its use in the investigation, Task Force Officer Joe Cahill had another law enforcement officer query the license plate through CCIC and the plate came back as "No Record." TFO Joe Cahill researched the issue and found that the plate was correctly entered into the CCIC system, but for reasons unknown, a secondary request had to be made by the Officer/Agency conducting the query to get the actual record as noted prior.

23. On March 15, 2019, the CHS called E. CAMACHO and their conversation was recorded. During the conversation, the CHS asked if E. CAMACHO was going to take care of him (VALENCIA), or if the CHS needed to "tip" him some "cheese" (money) for his time. E. CAMACHO said that he already paid him (VALENCIA) two bills ($200) to run the number for him.

24. On December 5, 2019, SA Jon E. Beutelschies and Task Force Officer Joe Cahill interviewed VALENCIA and the interview was recorded. VALENCIA said he knew E. CAMACHO and that he used to talk to him briefly. He said that they (police) used to do property watches around a big shed where they (Camachos) stored equipment. When asked about his relationship with J. CAMACHO, VALENCIA said that it was, "nothing." VALENCIA said he talked to J. CAMACHO a couple of times about a buying a truck and J. CAMACHO reached out to him about a truck in approximately February or March, but he never went out to look at it. VALENCIA said he would not call J. CAMACHO or E. CAMACHO just to talk and do not consider either of them really a friend. When asked if he ever ran a license plate for E. CAMACHO, VALENCIA said, "no, um." When asked the same about J. CAMACHO, VALENCIA said, no, but explained that there was one time that he was driving by (Camacho's property)  at 4:30 or 5:00 in the morning and there was a truck in the area and he ran the plate for himself because it was on a property watch. VALENCIA said he asked J. CAMACHO a few days afterwards if he knew who the person was and if they were allowed to be on his property, but that's the only time about a license plate that he could recall.   When asked if J. CAMACHO ever asked him to run a license plate, he said, "not that I recall." When asked if E. CAMACHO ever asked him to run a license plate, VALENCIA said, "no, he never did," and that he did not really talk to E. CAMACHO much at all.   VALENCIA was shown a copy of the CCIC log showing that he ran the license plate as referenced prior and he said he honestly could not remember. VALENCIA said he never got paid money and said, "I may have ran a plate, (unt) I did obviously run a plate, but it wasn't to benefit myself, or I didn't get any benefit out of it I never got paid nothing."   VALENCIA denied getting paid $200.00 to run the plate and said that he would take a polygraph. VALENCIA said if he recalled right, there was a vehicle

around his place and J. CAMACHO wanted to know who it was because that place was on a property watch.  VALENCIA said he does not remember if J. CAMACHO gave him a plate to run, but he knows that it was not E. CAMACHO.  VALENCIA said he obviously ran the plate, but he did not get any money for it.  VALENCIA said he gave J. CAMACHO the information from the plate, because it was his property.  When asked if J. CAMACHO texted the plate number to him, VALECNIA said, "no" and that he did not think so and did not remember.  Regarding the Domestic Violence incident between J. CAMACHO and his girlfriend, VALENCIA said that they were both out of control and he did not see any physical injuries and she did not cooperate.  VALENCIA said that J. CAMACHO talked to him a day or two later and thanked VALENCIA for not taking him to jail.  VALENCIA said he never gave J. CAMACHO a heads up about the cops coming.  VALENCIA said he heard that J. CAMACHO was a drug trafficker, but he was never involved in any kind of drug trafficking with him.  VALENCIA said that he did run a license plate, absolutely, but he did not know it was for any personal gain of drugs.  VALENCIA said he did not do anything that he would say was criminal and said that giving him (J. CAMACHO) the license plate information was wrong.  VALENCIA said that they (Camachos) never asked him to participate in illegal activity.  VALENCIA said that he ran that plate, but it wasn't for an illegal activity.  VALENCIA provided his cell phone number as 719-468-9403.

25. During the course of the investigation, the CHS talked to E. CAMACHO about having VALENCIA provide protection for his/her drug trafficking business and about CHS paying VALENCIA directly.  On March 19, 2019, E. CAMACHO told the CHS in a recorded telephone call that VALENCIA was out and did not want to do it.  E. CAMACHO said VALENCIA got all nervous because the CHS wanted to pay him directly and VALENCIA said, "fuck that."  E. CAMACHO said that VALENCIA thought that E. CAMACHO was going to give him the money and he did not want to meet anyone else.  E. CAMACHO said that VALENCIA was out and they would need to find someone else.

26. The CHS also talked to E. CAMACHO about having VALENCIA conduct a traffic stop on a drug associate to steal money in the vehicle of which he would get a part of (as part of a controlled operation by the FBI).  According to E. CAMACHO, VALENCIA was afraid that the parties he was ripping off would figure out who it was and it would come back on him.  E. CAMACHO said that VALENCIA was afraid they would kill him and that he would not risk his life and would not do it.

27. On January 16, 2020, your Affiant received information from Verizon Wireless pursuant to an Administrative Subpoena regarding telephone numbers 719-468-0595 (E. CAMACHO), 719-469-9203 (J. CAMACHO) and 719-468-9403 (VALENCIA).   My review of the data provided by Verizon Wireless indicates that all three numbers are active as of January 9, 2020.

28. Since the inception of the investigation, VALENCIA resigned from the RFPD and he is currently working for the United States Postal Service in Fowler, Colorado.

29. On January 23, 2020, Search Warrants, issued by United States Magistrate Judge Nina Y. Wang, District of Colorado, were executed on the persons of E. CAMACHO, J. CAMACHO

and VALENCIA and their cellular telephones, as detailed above, were seized.   On the same date, E. CAMACHO and J. CAMACHO were interviewed.  Both admitted that VALENCIA ran the license plate; however both denied paying him any money to do it.

## CONCLUSION

30. Based on the investigation described above, probable cause exists to believe that inside the Device(s) (described on Attachment A), will be found evidence, fruits, and instrumentalities of a violation of Title 18, United States Code, Section 1951; Title 21, United States Code, Section 843(b) and Title 18, United States Code, Section 371 (Conspiracy) (the "Subject Offenses") (described on Attachment B).

31. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

32. I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.


_s/Jon Beutelschies_
Jon Beutelschies, Special Agent
Federal Bureau of Investigation


SUBSCRIBED and SWORN before me by reliable electronic means this 4th day of February, 2020.

BY THE COURT:

MICHAEL E. HEGARTY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO


Application for search warrant was reviewed and is submitted by Zachary Phillips, Assistant United States Attorney.